# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DAVID CASPER,                    )
                                 )          3:12-cv-00204-LRH-VPC
            Plaintiff,           )
                                 )
      v.                         )          **REPORT AND RECOMMENDATION**
                                 )          **OF U.S. MAGISTRATE JUDGE**
RENEE BAKER, *et al.,*           )
                                 )
            Defendants.          )          August 23, 2013
_____)

        This Report and Recommendation is made to the Honorable Larry R. Hicks, United States

District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §

636(b)(1)(B) and LR IB 1-4.  Before the court is plaintiff's motion for summary judgment (#27)[1]

and defendants' cross-motion for summary judgment (#35).  Plaintiff opposed (#39) and defendants

replied (#41).  The court has thoroughly reviewed the record and recommends that plaintiff's motion

for summary judgment (#27) be denied and defendants' cross-motion for summary judgment (#35)

be granted in part and denied in part.

## I.  HISTORY & PROCEDURAL BACKGROUND

        Plaintiff David Casper ("plaintiff"), a *pro se* inmate, is currently incarcerated at Ely State

Prison ("ESP") in the custody of the Nevada Department of Corrections ("NDOC") (#5, p. 1).  On

May 7, 2012, plaintiff filed a civil rights complaint pursuant to 42 U.S.C. § 1983, alleging that

defendants Renee Baker, E.K. McDaniel and Adam Watson violated his Eighth, Fourteenth and First

Amendment rights (#5).  The court screened the complaint pursuant to 28 U.S.C. § 1915A, and

_____

[1] Refers to the court's docket numbers.

permitted the following claims to proceed: (1) Eighth Amendment claim for unconstitutional conditions of confinement (count I); (2) Eighth Amendment claim for deliberate indifference to medical needs (count I); (3) Fourteenth Amendment due process claim based upon no notice and no hearing regarding plaintiff's placement in an isolation cell (count II); (4) Fourteenth Amendment due process claim based upon deprivation of property (count II); and (5) First Amendment claim for denial of the right to correspond (count III) (#6, pp. 10-11).

Plaintiff alleges that his constitutional deprivations began on October 28, 2010, when he was transferred from a cell in ESP's disciplinary segregation unit to a "special isolation cell" in ESP's infirmary (#5, p. 3).

*Count I:*

Plaintiff alleges that in his "special isolation cell," he only has a mattress, a blanket, a pair of underwear, a t-shirt, socks, toilet paper and a bible (#5, p. 4).  Plaintiff is not permitted to have a towel, soap, toothbrush or toothpaste in his cell, and cannot wash his hands after he uses the toilet.  *Id.* at 5.  Plaintiff states that he has asked defendants for cleaning supplies to clean his cell, but they have denied his request.  *Id.*  Plaintiff claims that defendants are fully aware of the unconstitutional conditions under which he is incarcerated, but have taken no action.  *Id.*

Plaintiff also alleges that he has painful foot problems that have grown worse from walking in his cell barefoot, as he is not permitted to have shoes in the isolation cell.  *Id.* at 4.  Plaintiff complains of pain in his ankles, arches and the heels of his feet, and states that because of the pain, he is unable to walk or exercise in his cell.  *Id.* at 5.  Plaintiff alleges that he has seen a prison doctor on multiple occasions and the doctor acknowledged that he has a foot problem, but informed him that "the order for you to not be allowed shoes is over my head."  *Id.*  Plaintiff avers that the only thing the doctor could do for him was prescribe ibuprofen for the pain until prison officials again

permitted plaintiff to wear shoes.  *Id.*  Plaintiff claims that defendants are fully aware of his medical condition, but have exhibited deliberate indifference to his pain and his requests for shoes.  *Id.*

*Count II:*

Plaintiff alleges that his incarceration in the "special isolation cell" poses an atypical and significant hardship upon him (#5, p. 6).  Plaintiff also alleges that defendants did not provide him with any notice or a hearing as to why he was placed in such extreme living conditions and why all of his property was withheld.  *Id.*  Plaintiff claims that he has requested his property multiple times, but defendants have refused all of his requests.  *Id.*

*Count III:*

Plaintiff alleges that he is allowed writing privileges for a couple of hours at a time, but that his address book was withheld along with the rest of his property (#5, p. 7).  Plaintiff states that without his address book, he is unable to communicate with family and friends.  *Id.*

Defendants allege that plaintiff has been housed at ESP for over a decade, but in recent years, his prodigious skill at escape artistry has made him a unique security risk to the institution.  On May 9, 2008, plaintiff escaped his cell into the plumbing chase, and made it to the roof before he was apprehended (#35-1, Ex. A, pp. 5-6; #35-11, Ex. K, ¶ 4).  In preparation for this escape attempt, plaintiff manufactured various tools out of common prison items.  *Id.*  These tools included a periscope, which was used to study correctional officer perimeter shift changes through the roof of the building in which plaintiff was housed.  *Id.*  Plaintiff also manufactured a climbing rope, and various wrenches and prying devices (#35-10, Ex. J, p. 4).

On October 28, 2010, correctional officers discovered that plaintiff had modified his light fixture so that he could again escape into the plumbing chase outside of another ESP cell (#35-1, Ex. A, p. 6; #35-2, Ex. B, p. 6).  After plaintiff's second escape attempt, defendant McDaniel realized

that plaintiff could defeat the security measures in place in a standard ESP cell, despite the fact that correctional officers had increased the frequency of their cell searches (#35-11, Ex. K, ¶ 7). Accordingly, plaintiff was transferred to a cell in ESP's infirmary, where the cells are designed differently than the cells from which plaintiff had previously escaped. *Id.* The infirmary cell was also modified to prevent further escape attempts (#35-4, Ex. D, ¶ 5; #35-12, Ex. L, p. 11). For example, the cell was painted with a bright orange enamel paint to prevent plaintiff from concealing escape tools in the walls, and bars were placed on the windows. *Id.*

In December 2010, approximately two months after plaintiff was transferred to the infirmary cell, an x-ray revealed that plaintiff had hidden a crescent wrench and other contraband up his anal cavity (#35-11, Ex. K, ¶ 8).

In response to plaintiff's escape attempts, ESP officials have taken a number of precautions when dealing with plaintiff. First, no staff member may contact plaintiff without a member of ESP's Correctional Emergency Response Team ("CERT") present (#35-11, Ex. K, ¶ 10). Second, all of plaintiff's personal property (including his personal hygiene items and address book) are kept outside of his prison cell. *Id.* at ¶¶ 9, 11. However, plaintiff is allowed to use his personal hygiene items and access his address book upon request (#35-4, Ex. D, ¶ 8; #35-11, Ex. K, ¶ 12). A member of ESP's CERT delivers personal hygiene items and address book to plaintiff's cell, and then collects the items when plaintiff has finished using them. *Id.* at ¶¶ 12-13. Plaintiff's cell is equipped with a shower, and prison staff will activate the water flow so that plaintiff may bathe in his cell upon request (#35-4, Ex. D, ¶ 9). Plaintiff is not permitted to keep cleaning supplies in his cell because plaintiff has a demonstrated ability to use the abrasive qualities of cleaning agents, in combination with string or dental floss, to slowly cut through the metal components of his cell. *Id.* at ¶ 6. Third, from October 2010 through March 2012, plaintiff was not permitted to have shoes in

his isolation cell (#35-11, Ex. K, ¶ 14; #35-4, Ex. D, ¶ 4).  Given plaintiff's demonstrated resourcefulness at escape, shoes present plaintiff with an additional means to create escape tools or hide contraband (#35-11, Ex. K, ¶ 14).  Further, given the terrain around Ely, Nevada, it would be far more difficult for plaintiff to escape ESP without shoes than with shoes (#35-11, Ex. K, ¶ 14; #35-4, Ex. D, ¶ 4).  From October 2010 through March 2012, plaintiff was permitted to wear shoes whenever he left his cell, such as for exercise or any activity that required him to walk between buildings (#35-11, Ex. K, ¶ 14).  By March 2012, because of a long period of good behavior, defendant Watson felt that plaintiff was no longer as serious of an escape risk and arranged for plaintiff to have a pair of shower shoes in his cell (#35-4, Ex. C, ¶ 4).

Since plaintiff has been housed in ESP's infirmary, he has sent several medical kites to prison officials complaining of his foot condition (#36, Ex. E).  ESP medical staff have examined plaintiff many times, and plaintiff has received treatment for his ailments, including ibuprofen, ointment and bandages to treat the dry, bleeding skin on his feet.  *Id.* at 1-6.

Defendants move for summary judgment on the grounds that: (1) defendants provided plaintiff with personal hygiene products and cleaning supplies upon request (#35, p. 8); (2) defendants were not deliberately indifferent to plaintiff's medical needs (#35, pp. 5-7); (3) defendants provided plaintiff with notice and a hearing concerning his housing status (#35, pp. 8-10); (4) defendants have consistently allowed plaintiff to access essential personal property (#35, p. 10); (5) defendants provided plaintiff with due process for the deprivation of his non-essential personal property (#35, p. 11); (6) defendants have consistently allowed plaintiff to access his address book (#35, p. 12); and (7) defendants are entitled to qualified immunity for all of the security precautions taken to confine plaintiff.  *Id.* at 12-14.  Defendants attach several documents in support of their motion for summary judgment, including: (1) plaintiff's disciplinary history report (#35-1,

Ex. A);[2] (2) plaintiff's disciplinary forms for Offense in Custody ("OIC") No. 316091 (#35-2, Ex. B);[3] (3) the declaration of Adam Watson (#35-4, Ex. D); (4) plaintiff's medical records and medical kites (#36, Ex. E (*sealed*));[4] (5) the declaration of Dr. Michael Koehn (#35-7, Ex. G); (6) the relevant version of NDOC's Administrative Regulation ("AR") 707 and Inmate Disciplinary Manual (#35-8, Ex. H);[5] (7) photographs of some of the tools plaintiff created for his May 2008 escape (#35-10, Ex. J);[6] (8) the declaration of E.K. McDaniel (#35-11, Ex. K); and (9) defendants' responses to interrogatories (set one) (#35-12, Ex. L).

Plaintiff moves for summary judgment, and opposes defendants' motion on the grounds that: (1) for the first two years in ESP's infirmary, plaintiff's access to personal hygiene items was very sporadic (#39, p. 5); (2) plaintiff was not afforded an opportunity to clean his cell until June 20, 2012 (#27, p. 2); (3) plaintiff's painful foot problems would not have occurred if defendants had allowed him to have shoes in his cell (#39, p. 7); (4) although plaintiff received notice and a hearing for his October 28, 2010, disciplinary charges, he was not informed that he would be confined in ESP's infirmary in extreme isolation (#39, p. 9); (5) plaintiff's extreme property restrictions were not a part of his disciplinary hearing or a resulting sanction (#39, p. 9); and (6) plaintiff was not given access to his address book until June 20, 2012. *Id.* at 11, 112.

As a preliminary matter, the court notes that plaintiff is proceeding *pro se*. "In civil cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford

---

[2] Authenticated by the declaration of Harold M. Byrne (#35-3, Ex. C, ¶ 8).
[3] Authenticated by the declaration of Harold M. Byrne (#35-3, Ex. C, ¶ 9).
[4] Authenticated by the declaration of Scherrie Clinkscales (#35-6, Ex. F, ¶ 9).
[5] Authenticated by the declaration of Maxcine S. Blackwell (#35-9, Ex. I, ¶ 5).  The court notes that defendants have also provided NDOC's AR 733, concerning disciplinary segregation (#35-8, pp. 50-52).  However, the effective date of this document is June 17, 2012.  Accordingly, this document was not in effect at the time plaintiff was transferred to ESP's infirmary isolation cell and does not inform the court's analysis.
[6] Authenticated by the declaration of E.K. McDaniel (#35-11, Ex. K, ¶ 5).

plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II.  DISCUSSION & ANALYSIS

**A.      Legal Standards**

**1.  42 U.S.C. § 1983**

Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert,* 526 U.S. 286, 290 (1999).  Section 1983 does not offer any substantive rights, but provides procedural protections for federal rights granted elsewhere. *Albright v. Oliver,* 510 U.S. 266, 271 (1994).  To prove liability under § 1983, a plaintiff must: (1) show that a person acting under color of state law engaged in some type of conduct, which (2) deprived the plaintiff of some right, privilege or immunity secured by the Constitution or federal statutory law. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overturned on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

**2.  Summary Judgment Standard**

Summary judgment allows courts to avoid unnecessary trials where there are no factual disputes. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court will grant summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  However, the Supreme Court has noted:

> [W]e must distinguish between evidence of disputed facts and disputed matters of
> professional judgment.  In respect to the latter, our inferences must accord deference
> to the views of prison authorities.  Unless a prisoner can point to sufficient evidence

regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citations omitted).  Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting authenticated evidence to demonstrate the absence of any genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Orr v. Bank of America*, 285 F.3d 764, 773-74 (9th Cir. 2002).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial.  *Anderson*, 477 U.S. at 248.  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23.

On summary judgment the court is not to weigh the evidence or determine the truth of the matters asserted, but must only determine whether there is a genuine issue of material fact that must be resolved by trial.  *See Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).  Nonetheless, in order for any factual dispute to be genuine, there must be enough doubt for a reasonable trier of fact to find for the plaintiff in order to defeat a defendant's summary judgment motion.  *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**B.    Analysis**

**1.  Eighth Amendment Conditions of Confinement**

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which [the prisoner] is confined are subject to scrutiny under the Eighth Amendment."  *Helling v.*

*McKinney*, 509 U.S. 25, 31 (1993); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Although prison conditions may be restrictive and harsh, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care and personal safety. *Id.*; *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982) (citation omitted). The court must analyze each condition separately to determine whether a specific condition violates the Eighth Amendment. *See Hoptowit*, 682 F.2d at 1246-47. "Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). When considering the conditions of confinement, the court should consider the amount of time to which the prisoner was subjected to the condition. *See Hutto v. Finney*, 437 U.S. 678, 686-87 (1978); *Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005); *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003).

Plaintiff alleges that he has been housed in unconstitutional conditions since October 28, 2010 (#5, p. 4). Specifically, plaintiff alleges that he only has a mattress, a blanket, a pair of underwear, a t-shirt, socks, toilet paper and a Bible, and that he was not permitted to have a towel, soap, toothbrush or toothpaste in his cell. *Id.* Plaintiff also alleges that defendants denied his requests for cleaning supplies. *Id.*

After plaintiff's second nearly successful escape attempt in October 2010, prison officials logically determined that he could no longer be housed in a standard ESP cell (#35-11, Ex. K, ¶ 9). Prison officials also concluded that much of plaintiff's personal property should be kept outside his prison cell.[7] *Id.* Plaintiff has been permitted to use essential personal hygiene items—such as a

---

[7] The court notes that despite these precautions, plaintiff was caught with a crescent wrench and other contraband up his

towel, soap, toothbrush and toothpaste (#35-11, Ex. K, ¶ 13; #35-4, Ex. D, ¶ 8).  Plaintiff's cell is also equipped with a shower, and prison staff will turn on the water so that plaintiff may bathe in his cell upon request (#35-4, Ex. D, ¶ 9).  Although plaintiff asserts that the frequency with which he was initially provided personal hygiene products was inadequate, plaintiff has failed to submit any evidence showing the court how often he requested his personal hygiene products versus how often he was given an opportunity to use them.

Prison officials properly determined that plaintiff should not be permitted to keep cleaning supplies in his cell due to security concerns that plaintiff would use the abrasive qualities of the cleaning agents, in combination with string or dental floss, to slowly cut through the metal components of his cell (#35-4, Ex. D, ¶ 6).  It is undisputed that plaintiff was permitted to clean his cell on June 20, 2012 (#27, p. 91).  Defendants have submitted evidence that plaintiff requested cleaning supplies, CERT provided plaintiff with cleaning supplies, and then CERT removed the supplies once plaintiff had finished cleaning his cell (#35-12, Ex. L, p. 9).  Plaintiff submitted an informal grievance, dated March 23, 2012, in which he complained that his cell had not been cleaned for one and a half years, and that he had requested cleaning supplies multiple times (#27, p. 88).  However, plaintiff has failed to provide the court with any prior grievances showing that he had, in fact, requested cleaning supplies prior to March 2012.

Although the court agrees that plaintiff's confinement in ESP's infirmary is more restrictive than his previous confinement in ESP's administrative segregation unit, there is nothing in the record to indicate that the conditions of plaintiff's confinement are so intolerable as to constitute an Eighth Amendment violation.  Defendants have not denied plaintiff food, shelter, clothing, basic sanitation, medical care or personal safety.  *See Farmer*, 511 U.S. at 832.  There is also nothing in the record to

anal cavity in December 2010 (#35-11, Ex. K, ¶ 8).

suggest that with continued good behavior, plaintiff cannot regain some of his lost privileges.[8] Accordingly, the court recommends that defendants' cross-motion for summary judgment be granted as to plaintiff's Eighth Amendment conditions of confinement claim.

### 2.   Eighth Amendment Deliberate Indifference to a Serious Medical Need

A prisoner's claim of inadequate medical care arises under the Eighth Amendment.  *See Whitley v. Albers*, 475 U.S. 312, 319 (1986).  The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency."  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).  To prevail in an action alleging cruel and unusual punishment, a plaintiff's case must satisfy an objective standard— that the deprivation was serious enough to amount to cruel and unusual punishment; and a subjective standard—deliberate indifference.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Wilson v. Seiter*, 501 U.S. 294, 297-304 (1991).  A prison official violates the Eighth Amendment when he responds with deliberate indifference to an inmate's serious medical needs.  *Farmer*, 511 U.S. at 834.

The objective requirement of a "serious medical need" is met if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle*, 429 U.S. at 104).  In this circuit, examples of serious medical needs include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citations omitted).

---

[8] The court notes that plaintiff has regained the privilege of wearing shower shoes inside his cell (#35-4, Ex. C, ¶ 4).

The subjective standard of deliberate indifference requires "more than ordinary lack of due care for the prisoner's interests or safety." *Farmer*, 511 U.S. at 835 (quoting *Whitley*, 475 U.S. at 319). The requisite state of mind lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at 836. To prove deliberate indifference, a plaintiff must demonstrate that prison staff denied, delayed, or intentionally interfered with medical treatment, or that the manner in which prison staff provided medical care indicated deliberate indifference; and that plaintiff sustained damages as a result of such conduct. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

The State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns. *Hudson v. McMillan*, 503 U.S. 1, 7 (1992) (citation omitted). However, in some cases it may be important to balance the "competing tensions" between the "prisoners' need for medical attention and the government's need to maintain order and discipline," in determining the prison officials' subjective intent. *Clement v. Gomez*, 298 F.3d 898, 905 n.4 (9th Cir. 2002).

Plaintiff alleges that defendants have exhibited deliberate indifference to his painful, bleeding foot problems, in violation of the Eighth Amendment (#5, p. 5). Plaintiff claims that his painful foot problems have grown worse from walking barefoot in his concrete cell, as defendants will not permit him to have shoes in his cell. *Id.* at 4. Plaintiff also claims that a prison doctor agreed that plaintiff's painful foot problems would be alleviated if plaintiff could simply wear shoes, but has informed him that "the order for you to not be allowed shoes is over my head." *Id.* at 5.

The court finds that defendants did not exhibit deliberate indifference to plaintiff's serious medical needs. First, there is no evidence that plaintiff's foot problems constituted a serious medical need. Plaintiff's medical progress notes indicate that plaintiff had "cracked, dry feet" which "bleed,"

however, the progress notes do not indicate that plaintiff's foot condition was a serious medical concern (#36, Ex. E, pp. 2-6 (*sealed*)).

Second, even assuming *arguendo* that plaintiff's cracked, dry feet constituted a serious medical need, there is no indication that defendants Baker, McDaniel and Watson or any ESP medical provider denied, delayed, or otherwise disregarded plaintiff's medical condition, or chose a medically unacceptable course of treatment "in conscious disregard of an excessive risk" to plaintiff's health. *See Hutchinson*, 838 F.2d at 394; *Jackson*, 90 F.3d at 332. Instead, ESP medical staff examined plaintiff's feet multiple times, and offered him ointment, bandages, ibuprofen and patient education (#36, Ex. E, pp. 2-6 (*sealed*)). Although plaintiff alleges that his painful, bleeding foot problems would be cured if defendants simply permitted him to wear shoes inside his cell, "[u]ncorroborated and self-serving testimony" without more, will not create a genuine issue of material fact precluding summary judgment. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Further, plaintiff's allegations are belied by the record. *See* Dr. Michael Koehn's declaration, #35-7, Ex. G, ¶ 6 ("[N]one of Mr. Casper's alleged medical problems are caused by a lack of shoes or other footwear, none of his alleged medical problems require or have required footwear as a treatment . . ..").

Finally, the court notes that this case presents the type of circumstance contemplated in *Clement*. Plaintiff has managed to escape two cells in Nevada's only maximum security facility (#35-1, Ex. A, pp. 5-6; #35-2, Ex. B, p. 6; #35-11, Ex. K, ¶¶ 4, 7). He has manufactured escape tools from ordinary prison items, and he has successfully concealed these tools from prison authorities (#35-11, Ex. K. ¶¶ 4, 7-8). Thus, in determining defendants' subjective intent, it is important to balance plaintiff's need for constitutionally adequate medical care with ESP's need to maintain order and prevent prisoner escape. *See Clement*, 298 F.3d at 905 n.4. The evidence

suggests that shoes may present plaintiff with an additional opportunity to create escape tools or conceal contraband. *Id.* at ¶ 14. Given the terrain around Ely, Nevada, it would also be far more difficult for plaintiff to escape ESP without shoes than with shoes. *Id.* Considering plaintiff's demonstrated proclivity for escape, the court finds that defendants reasonably denied plaintiff's requests to have shoes in his cell.

Plaintiff's claim that defendants Baker, McDaniel and Watson exercised deliberate indifference to his serious medical needs is contrary to the evidence before the court. Plaintiff has failed to demonstrate the existence of any genuine issue of material fact, and he has failed to produce any evidence to suggest that defendants acted in conscious disregard of a significant risk to plaintiff's health. Accordingly, the court recommends that defendants' cross-motion for summary judgment be granted as to plaintiff's Eighth Amendment deliberate indifference claim.

### 3. Fourteenth Amendment Due Process

The Due Process Clause of the Fourteenth Amendment protects individuals from arbitrary government action by prohibiting states from depriving people of "life, liberty, or property without due process of law." U.S. Const. amend. XIV. A valid due process claim has three prerequisites: (1) the deprivation, (2) of a liberty or property interest, (3) by officials acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 536-37 (1981). To prevail on a claim of deprivation of liberty or property without due process of law, a plaintiff must first establish the existence of a protected liberty or property interest. After meeting this threshold requirement, the plaintiff must then demonstrate that the defendants failed to provide the process due. *See Wolff v. McDonnell*, 418 U.S. 539, 556-57 (1974); *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003).

*Plaintiff's Confinement in ESP's Infirmary:*

Liberty interests may arise from two sources—the Due Process Clause itself or state law. *Hewitt v. Helms*, 459 U.S. 460, 466-68 (1983), *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).  The Due Process Clause itself does not confer a liberty interest in freedom from state action taken "within the normal limits or range of custody which the conviction has authorized the State to impose."  *Sandin*, 515 U.S. at 478 (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)).  Thus, the Supreme Court has found that the Due Process Clause does not afford prisoners a liberty interest in being free from intrastate prison transfers, *Meachum*, 427 U.S. at 225, or in remaining in the general prison population.  *Hewitt*, 459 U.S. at 468; *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) ("administrative segregation falls within the terms of confinement ordinarily contemplated by a sentence.")  However, in certain circumstances, states may create liberty interests protected by the Due Process Clause.  *Sandin*, 515 U.S. at 483-84.  For example, in *Sandin*, the Court found that a liberty interest in avoiding transfer to particular conditions of confinement may arise from state prison regulations if the transfer "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin*, 515 U.S. at 484; *Wilkinson v. Austin*, 545 U.S. 209, 222 (2005).

Once a protected liberty interest has been found, the court need only decide what process is due, which is a question of law, and then decide whether defendants have provided the process due.  *Quick v. Jones*, 754 F.2d 1521, 1523 (1984).  When an inmate faces disciplinary charges, prison officials must provide the inmate with: (1) a written statement at least twenty-four hours before the disciplinary hearing that includes the charges and a description of the evidence against the prisoner; (2) an opportunity to present documentary evidence and call witnesses, unless calling witnesses would be unduly harmful to institutional security or correctional goals; (3) legal assistance where the

charges are complex or the inmate is illiterate; and (4) a written statement by the factfinders detailing

the evidence relied upon and the reasons for the disciplinary action. *Wolff*, 418 U.S. at 563-70.  In

addition, the findings of the prison disciplinary board must be supported by some evidence in the

record. *Superintendent v. Hill*, 472 U.S. 445, 454 (1985).  This standard is met if "there was some

evidence from which the conclusion of the administrative tribunal could be deduced . . . ."  *Id.* at 455

(citing *U.S. ex rel. Vajtauer v. Commissioner of Immigration*, 273 U.S. 103, 106 (1927)).

Plaintiff alleges that his incarceration in ESP's "special isolation cell" poses an atypical and

significant hardship upon him, and that defendants never provided him with any notice or a hearing

as to why he was confined in such extreme living conditions (#5, p. 6; #39, p. 9).  In plaintiff's

complaint, he simply states that he was transferred from the disciplinary segregation unit to ESP's

infirmary (#5, p. 3).  Thus, plaintiff phrases his housing complaints as administrative in nature.

However, in reality, plaintiff is housed in ESP's infirmary as both an administrative attempt to

prevent his escape and pursuant to his disciplinary segregation.

On October 28, 2010, ESP correctional officers discovered that plaintiff had modified his

light fixture so that he could again gain access to the plumbing chase outside of his cell (#35-1, Ex.

A, p. 6; #35-2, Ex. B, p. 6).  At that point, plaintiff was transferred to ESP's infirmary, which is the

only area of the prison where the cells are designed differently than the cells from which plaintiff

had previously escaped (#35-11, Ex. K, ¶ 7).  On November 3, 2010, plaintiff received a copy of the

notice of charges and attended a preliminary hearing (#35-2, Ex. B, p. 6).  At the hearing, plaintiff

pled not guilty to: (1) MJ47: Escape, (2) MJ26: Possession of contraband, (3) MJ23: Property

damage greater than $50; (4) G15: Presence in an unauthorized area, and (5) MJ22: Tampering with

a locking device.  *Id.* at 8.  On November 24, 2010, plaintiff attended a disciplinary hearing where he

elected to remain silent and did not request a witness.  *Id.* at 5.  The disciplinary hearing officer

found plaintiff guilty of all charges based on the evidence recovered from the scene, photographs of plaintiff's cell, and officer reports of statements plaintiff allegedly made at the time of the incident. *Id.* at 3.  The hearing officer sanctioned plaintiff to five years and ninety days in disciplinary segregation and restitution.  *Id.* at 4.

The court finds that plaintiff's confinement in ESP's "special isolation cell" implicates a protected liberty interest.  However, defendants did not violate plaintiff's procedural due process rights.  Plaintiff claims that defendants should have provided him with notice and a hearing as to their reasons for housing him in ESP's infirmary.  However, the record indicates that plaintiff was well aware of the charges against him and had a meaningful opportunity to contest those charges through his disciplinary proceedings.  Due process does not require prison administrators to provide inmate's with notice that they will be housed in any particular cell or a hearing to contest their confinement in any particular cell.  Further, plaintiff cannot legitimately claim that he did not know why prison administrators decided to confine him in ESP's infirmary, since plaintiff apparently had the potential ability to escape from every other cell in the institution.

The court finds that defendants housed plaintiff in ESP's infirmary due, in part, to disciplinary sanctions he received as a result of his October 28, 2010, escape attempt.  The court also finds that defendants provided plaintiff with due process through his disciplinary proceedings.  Plaintiff received a written notice of charges well in advance of his disciplinary hearing which included a detailed description of the evidence against him; an opportunity to present evidence and call witnesses; and a written statement detailing the evidence the hearing officer relied upon and the reasons for the disciplinary action (#35-2, Ex. B).  Plaintiff was not entitled to specific notice that he would serve his five-year and ninety-day disciplinary segregation in ESP's infirmary or to a hearing on this issue.  Accordingly, the court recommends that defendants' cross-motion for summary

judgment be granted as to plaintiff's Fourteenth Amendment due process claim regarding

confinement in ESP's infirmary.

> _Plaintiff's Property:_

To prevail on a claim of deprivation of property without due process of law, a plaintiff must

first establish the existence of a constitutionally protected interest in the property.  _See Ingraham v._

_Wright_, 430 U.S. 651, 672-73 (1997).  After meeting this threshold requirement, the plaintiff must

then demonstrate that defendants failed to provide the process due.  _Wolff_, 418 U.S. 556-57.

Prisoners retain certain property interests despite being incarcerated.  For example, courts

have held that inmates have constitutionally protected property interests in hobby kits ordered while

in prison, _Parrat v. Taylor_, 451 U.S. 527, 536 (1981); funds in their inmate accounts, _Quick v. Jones_,

754 F.2d 1521, 1523 (9th Cir. 1984); and books, _Caldwell v. Miller_, 790 F.2d 589, 608 (7th Cir.

1986).  Prisoners also have a protected property interest in their personal property.  _See Hansen v._

_May_, 502 F.2d 728, 730 (9th Cir. 1974).

Even when an inmate has a protected property interest in a particular item, it does not

necessarily mean that the inmate may possess that item while incarcerated.  Authorized property

deprivations are permissible if conducted pursuant to a regulation that is reasonably related to a

legitimate penological interest. _Turner v. Safley_, 482 U.S. 78, 89 (1987).  An authorized deprivation

occurs pursuant to "state law, regulation, or institutionalized practice," and the normal pre-

deprivation hearing is required to satisfy due process.  _Haygood v. Younger,_ 769 F.2d 1350,1357

(9th Cir.1985) (en banc), _cert. denied,_ 478 U.S. 1020 (1986) (citing _Logan v. Zimmerman Brush Co.,_

455 U.S. 422, 436 (1982)).

Plaintiff alleges that upon his transfer to ESP's infirmary, defendants confiscated all of his

property, and never provided him with any notice or a hearing as to why his property was withheld

(#5, p. 6).  Plaintiff asserts that defendants never provided him with any due process for this atypical situation, and that his disciplinary proceedings did not involve any property sanctions.  *Id.*  Further, plaintiff claims that he has repeatedly asked defendants to return his property, including legal papers, photos, letters and books, but they have refused his requests.  *Id.*

Defendants make several arguments with regard to plaintiff's property claim.  First, defendants claim that plaintiff has not been "deprived" of his property because the property is stored outside his cell and made available for his use (#35, p. 10).  Second, they contend that plaintiff's disciplinary proceedings "afforded him all of the process due him to enable prison authorities to make the determination to store the property outside his cell."  *Id.*  Third, defendants admit that plaintiff has been deprived of some of his property, such as electronic appliances, but claim that he was deprived of these property items pursuant to his placement in disciplinary segregation.  *Id.* at 11.[9]

The court finds that it does not have adequate information to determine whether plaintiff's Fourteenth Amendment due process rights were violated.  Although defendants have clearly conducted an authorized, intentional deprivation of plaintiff's personal property, they have not provided the court with any particular "state law, regulation, or institutionalized practice," under which their actions were permissible.  *See Haygood*, 769 F.2d at 1357.  They have also failed to submit any evidence which would allow the court to decide whether confiscating every single item

_____

[9] Defendants also argue that they are entitled to summary judgment because plaintiff neglected to pursue appropriate state post-deprivation remedies (#35, p. 11).  Defendants contend that because Nevada provides a post-deprivation remedy, the deprivation of plaintiff's property was not a constitutional violation.  *Id.*  Defendants completely misunderstand the law on this point.  It is clear that plaintiff alleged an authorized, intentional deprivation of property— which is actionable under the Due Process Clause (#6, p. 7).  *See Hudson v. Palmer*, 468 U.S. 517, 532 n. 13 (1984).  Plaintiff did not allege a negligent or unauthorized, intentional deprivation of property.  If he had, then Nevada's post-deprivation remedies may be relevant to this analysis.  *See Parratt v. Taylor*, 451 U.S. 527, 537-38 (1981), *overruled on other grounds by Daniel v. Williams*, 474 U.S. 327 (1986); *Hudson*, 468 U.S. at 533.  Here, they are not.

of plaintiff's personal property (except for a Bible) was reasonably related to legitimate penological

interests.

The court agrees that limiting certain property items (such as items that could be fashioned

into escape tools or items that could conceal contraband) is reasonably related to the prison's interest

in preventing escape.  However, defendants have made no showing that limiting *all* property items

reasonably advances prison interests.  Further, defendants' non-specific claim that plaintiff has not

been "deprived" of his property because the property is stored outside his cell and made available for

his use, is simply not supported by the record.  It appears that some property items are kept outside

of plaintiff's cell and given to him upon request (#35-12, Ex. L, p. 5).  However, it appears that a

great many other property items are secured in ESP's property room or the CERT office.  *Id.*

Finally, the court notes that unlike plaintiff's Fourteenth Amendment due process claim

regarding his confinement in ESP's infirmary, plaintiff did not receive any due process regarding the

confiscation of his property.  Plaintiff was transferred to ESP's infirmary, in part, due to disciplinary

sanctions from his October 28, 2010, escape attempt—for which plaintiff received a disciplinary

hearing.  However, there is no record that plaintiff's disciplinary sanctions included any sort of full-

scale property confiscation.  The court notes that at the time of plaintiff's October 28, 2010, escape

attempt, he was already housed in the disciplinary segregation unit as a High Risk Potential ("HRP")

inmate.  Thus, the court presumes that the property plaintiff possessed at that time fell within the

restrictions inherent in disciplinary segregation.  Defendants have not submitted any evidence

suggesting that any additional property should have been withheld as a sole consequence of

plaintiff's November 24, 2010, disciplinary sanctions.

The court finds that the record is deficient as to NDOC's regulations governing property

confiscation, Ely's penological interests in confiscating *all* of plaintiff's personal property, and any

sort of procedural due process that plaintiff may or may not have been afforded.  Instead, the record is rife with genuine issues of material fact precluding summary judgment on either side. Accordingly, the court recommends that defendants' cross-motion for summary judgment be denied as to plaintiff's Fourteenth Amendment due process claim regarding the confiscation of his personal property.

### 4.  First Amendment Right to Correspond

Prisoners enjoy a First Amendment right to send and receive mail.  *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (per curium).  Prison regulations concerning outgoing prisoner mail must further "important or substantial governmental interests unrelated to the suppression of expression," *Procunier v. Martinez*, 416 U.S. 396, 413 (1974), *limited by Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989), but such regulations must at least more closely fit the interests served than regulations concerning incoming mail.  *See Thornburgh*, 490 U.S. at 412; *Barrett v. Belleque*, 544 F.3d 1060, 1062 (9th Cir. 2008) (per curium); *Witherow*, 52 F.3d at 265.

A prison may adopt regulations which impinge on a prisoner's First Amendment rights if the regulations are "reasonably related to legitimate penological interests." *Witherow*, 52 F.3d at 265 (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  Legitimate penological interests include security, order and rehabilitation.  *Procunier*, 416 U.S. at 412-13 ("the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence.").

Plaintiff alleges that defendants violated his First Amendment right to correspond by withholding his address book so that plaintiff was unable to communicate with family and friends (#5, p. 7).  Defendants contend that plaintiff was never denied access to the information in his

address book, and that he was always permitted to access the address book upon request (#35, p. 12). This contention is belied by the record.

Plaintiff has submitted a series of grievances which indicate that he did not have access to his address book from October 28, 2010 until June 20, 2012, although he filed multiple prison grievances requesting the book as early as July 2011 (#27, Ex. H, pp. 107-114; *see* defendant Baker's response to Grievance Log No. 2006-29-941130 ("You were given access to your address book on 6/20/12. It will be maintained outside of your cell and you can request to review it as needed via CERT."). After June 20, 2012, it appears that plaintiff's address book was kept outside his cell, and he was permitted to access the book upon request (#35-11, Ex. K, ¶¶ 11-12; #35-12, Ex. L, p. 8). A member of CERT would deliver the address book to plaintiff's cell and would then retrieve it when plaintiff was finished using it (#35-11, Ex. K, ¶ 12).

Defendants acknowledge that plaintiff is entitled to basic First Amendment rights, including the right to access the information within his address book so that he may correspond with family and friends (#35, p. 12). It is unknown why defendants did not permit plaintiff to access this information until June 20, 2012. By that time, plaintiff had been housed in ESP's infirmary isolation cell for over nineteen months. Defendants had worked out a system to provide plaintiff with certain personal hygiene items and to provide plaintiff with shoes whenever he travelled outside his isolation cell (#35-11, Ex. K. ¶¶ 13, 15). Thus, the motivation behind defendants' decision to withhold the information within plaintiff's address book until June 20, 2012, is a genuine issue of material fact for trial. Defendants have not provided the court with any information as to the penological interests justifying such a course of action. Accordingly, the court recommends that defendants' cross-motion for summary judgment be denied as to plaintiff's First Amendment right to correspond claim.

### 5.  Qualified Immunity

Where a plaintiff has stated a valid cause of action under 42 U.S.C. § 1983, government officials sued in their individual capacities may raise the affirmative defense of qualified immunity. *See Spoklie v. Montana*, 411 F.3d 1051, 1060 (9th Cir. 2005).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  This immunity is granted broadly and "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1240 (9th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "In considering a claim of qualified immunity, the court must determine 'whether the facts that a plaintiff has alleged … make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'"  *Id*. (quoting *Pearson*, 555 U.S. at 232.  Whether a right is clearly established turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."  *Id*.

"[A] district court should decide the issue of qualified immunity as a matter of law when 'the material, historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts.'"  *Conner v. Heiman*, 672 F.3d 1126, 1131 (9th Cir. 2012) (quoting *Peng v. Mei Chin Penghu*, 335 F.3d 970, 979-80 (9th Cir. 2003)).  "Only where 'historical

facts material to the qualified immunity determination are in dispute' should the district court submit the issue to a jury." *Conner*, 672 F.3d at 1131 (quoting *Torres v. City of Los Angeles*, 548 F.3d 1197, 1211 (9th Cir. 2008)).

Defendants generally argue that because plaintiff presents a unique escape risk, defendants are entitled to qualified immunity for any acts that may have run afoul of plaintiff's constitutional rights (#35, p. 13). The court disagrees.

### Confiscation of Plaintiff's Personal Property

It is clearly established that plaintiff possesses a Fourteenth Amendment due process right to a pre-deprivation hearing before an authorized property deprivation. *Haygood*, 769 F.2d at 1357 (citation omitted). It is also clearly established that an authorized property deprivation is permissible if it is reasonably related to a legitimate penological interest. *Turner*, 482 U.S. at 89. Here, however, the record is silent as to NDOC's regulations governing property confiscation, Ely's penological interests in confiscating *all* of plaintiff's personal property, and any sort of procedural due process that plaintiff may or may not have been afforded. When analyzing a claim of qualified immunity, the court must view the facts in the light most favorable to the plaintiff. *Saucier*, 533 U.S. at 201. When doing so here, defendants confiscated all of plaintiff's personal property with no notice or pre-deprivation process. Thus, the propriety of defendants' actions is dependent upon the resolution of multiple issues of material fact. As this is a case where "historical facts material to the qualified immunity determination" are in dispute, *Torres*, 548 F.3d at 1211, the court finds that qualified immunity would be inappropriate on this claim.

### Right to Correspond

It is clearly established that plaintiff possesses a First Amendment right to correspond with others by sending and receiving mail. *Witherow*, 52 F.3d at 265; *Procunier*, 416 U.S. at 408. There

is also no doubt that defendants' refusal to provide plaintiff with the information contained within his address book effectively prohibited him from exercising his right to correspond with family and friends.  Defendants do not argue that plaintiff had no constitutional right to the information contained within his address book, or that defendants had a legitimate penological interest in withholding this information from October 28, 2010 until June 20, 2012.  Instead, defendants argue that plaintiff was never denied access to the information in his address book (#35, p. 12).  As noted previously, this contention is unsupported by the record (#27, Ex. H, pp. 107-114).

Although the court acknowledges that "the informed judgment of prison officials is to be afforded deference," *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994), the court also recognizes that there are limits to how long a state may suspend an inmate's First Amendment rights.  In this case, when viewing the facts in the light most favorable to plaintiff, defendants withheld the information in plaintiff's address book for over nineteen months, effectively preventing plaintiff from exercising his right to correspond with family and friends.

The court finds that the propriety of defendants' delay in providing plaintiff with the requested information from his address book is dependent upon resolution of the factual disputes in this case.  Although defendants argue that plaintiff's ability to manufacture escape tools out of regular prison items necessitated the withholding of his property (#35, p. 13), they do not explain why it was necessary to withhold the *information* contained within plaintiff's address book.  In an effort to meet plaintiff's constitutional requirements, defendants "craft[ed] the unique solution of securing [plaintiff's property] outside his cell and having correctional officers deliver it to him as he needed it" (#35, p. 14).  However, defendants do not explain why it took them nineteen months to do this with regard to plaintiff's address book.

Without further information, the court cannot find that a reasonable prison official would believe that depriving an inmate of his ability to correspond with family and friends for over nineteen months was constitutionally permissible.  As this is a case where "historical facts material to the qualified immunity determination are in dispute," qualified immunity is inappropriate at this juncture.  *See Torres*, 548 F.3d at 1211; *Wilkins v. City of Oakland*, 350 F.3d 949, 955-56 (9th Cir. 2003) (whether officers made a reasonable mistake of fact or law may depend on the jury's resolution of disputed facts); *Lolli v. County of Orange*, 351 F.3d 410, 421-22 (9th Cir. 2003).

A jury could find that defendants' approximately nineteen-month delay in providing plaintiff with the information in his address book was unreasonable, and therefore, constitutionally infirm. Under such circumstances, defendants' actions are not protected by qualified immunity. Accordingly, the court recommends that defendants' cross-motion for summary judgment be denied as to the defense of qualified immunity.

## III.  CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that defendants are entitled to summary judgment in their favor as to plaintiff's Eighth Amendment claims and Fourteenth Amendment due process claim related to his confinement in ESP's infirmary.  However, defendants are not entitled to summary judgment in their favor as to plaintiff's Fourteenth Amendment due process claim related to the confiscation of his property or his First Amendment claim.  Therefore, the court recommends that defendants' cross-motion for summary judgment (#35) be **GRANTED** in part and **DENIED** in part.  The court also recommends that plaintiff's motion for summary judgment (#27) be **DENIED** in its entirety.   The parties are advised:

1.      Pursuant to 28 U.S.C. § 636(b)(1)(c) and LR Rule IB 3-2,  the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt.

These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.      This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV.      RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that plaintiff's motion for summary judgment (#27) be **DENIED** in its entirety.  **IT IS ALSO RECOMMENDED** that defendants' cross-motion for summary judgment (#35) be **GRANTED** in part and **DENIED** in part, as follows:

**IT IS RECOMMENDED** that defendants' cross-motion for summary judgment be **GRANTED** as to plaintiff's Eighth Amendment conditions of confinement claim.

**IT IS FURTHER RECOMMENDED** that defendants' cross-motion for summary judgment be **GRANTED** as to plaintiff's Eighth Amendment deliberate indifference to medical needs claim.

**IT IS FURTHER RECOMMENDED** that defendants' cross-motion for summary judgment be **GRANTED** as to plaintiff's Fourteenth Amendment due process claim related to his housing in ESP's infirmary.

**IT IS FURTHER RECOMMENDED** that defendants' cross-motion for summary judgment be **DENIED** as to plaintiff's Fourteenth Amendment due process claim related to the confiscation of his personal property.

**IT IS FURTHER RECOMMENDED** that defendants' cross-motion for summary judgment be **DENIED** as to plaintiff's First Amendment right to correspond claim.

**IT IS FURTHER RECOMMENDED** that defendants' cross-motion for summary judgment be **DENIED** as to plaintiff's affirmative defense of qualified immunity.


**DATED:** August 23, 2013.

_____

**UNITED STATES MAGISTRATE JUDGE**